FILED

IN THE UNITED STATES DISTRICT COURT
UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NEW MEXICO

MAY 3  2001


CLERK

KELSIE C. MILLER,

Plaintiff,

vs.

No. CIV 98-1174 LH/LFG

KENNETH S. APFEL, Commissioner,
Social Security Administration,

Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Kelsie C. Miller ("Miller") invokes this Court's jurisdiction under 42 U.S.C. §

405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner"). The Commissioner determined that Miller was not eligible for disability

insurance benefits ("DIB") or supplemental security income benefits ("SSI"). Miller moves this

Court for an order reversing the Commissioner's final decision.

Miller was born July 30, 1951 and was 46 years old at the time of the latest administrative

hearing in this case. He did not graduate from high school but has earned a GED. His prior work

experience is as a maintenance man, messenger, and laborer on a commercial fishing boat. Miller

alleges that he has been unable to work since September 1, 1989. On January 2, 1991, he filed

---

[1]Within ten (10) days after a party is served with a copy of the legal analysis and
recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to
such analysis and recommendations. A party must file any objections within the ten day period
allowed if that party wants to have appellate review of the analysis and recommendations. If no
objections are filed, no appellate review will be allowed.

an application for DIB and SSI, alleging disability due to psychological impairments and alcoholism.

## Procedural History

Miller's initial application was denied at the initial and reconsideration stages, and he sought timely review from an Administrative Law Judge ("ALJ"). Following an administrative hearing, ALJ Neufeld ruled against Miller on August 26, 1992.

On appeal, the Appeals Council remanded for a new hearing. Judge Neufeld again ruled against Miller, in a decision dated April 7, 1994. Following the Appeals Council's denial of Miller's request for review, he filed an appeal in United States District Court, which resulted in reversal and remand for a new hearing. *See*, Miller v. Chater, No. Civ. 94-953 BB/LCS (D.N.M. Feb. 16, 1996). Miller filed a new SSI application during pendency of the judicial proceedings; this claim was denied, and Miller's request for a hearing on this new application was consolidated for hearing with the first application. On remand from the District Court, a third administrative hearing was held before ALJ Waits. Judge Waits ruled against Miller on August 30, 1996.

Miller again appealed. On January 3, 1997, the Appeals Council remanded the case back to Judge Waits, ordering yet another hearing and directing the ALJ to obtain the testimony of vocational expert ("VE"), to clarify the effect of Miller's impairments on the occupational base. Judge Waits did not comply with these directives but instead, on June 26, 1997, reinstated his prior decision without holding a hearing. The Appeals Council then remanded the case for a new hearing before a new ALJ.

This final hearing took place on April 23, 1998, before ALJ Nail. Miller did not appear

2

at this hearing, having attended several prior hearings.  His attorney explained that his client was

waiving his appearance, "given what he perceives to be the futility of what's gone [on] in the last

seven years," and given his "propensity for violence."  (Tr. 320).  Judge Nail ruled against

Miller, in an opinion dated July 29, 1998.  This appeal followed.

In order to recover DIB benefits under Title II, Miller must establish that his disability

commenced prior to his date last insured, Potter v. Secretary of Health & Human Services, 905

F.2d 1346, 1348-49 (10th Cir. 1990), which was December 31, 1992, and that it had lasted or

was expected to last at least twelve months.  However, the ALJ may consider evidence of Miller's

condition outside of this time period for the purpose of providing a full picture of the claimant's

medical treatment history.  Dugan v. Sullivan, No. 89-1121-C, 1991 WL 105230, at * 4 (D. Kan.

May 31, 1991).  For example, when the claimant's later medical records contain references to

medical findings dating from the relevant period, or "disclose the severity and continuity of

impairments existing before the earning requirement date or . . . identify additional impairments

which could reasonably be presumed to have been present and to have imposed limitations as of

the earning requirement date." Baca v. Dept. of Health & Human Servs., 5 F.3d 476, 479 (10th

Cir. 1993).

The 12-month requirement applies to claims for SSI benefits under Title XVI, as well as

to DIB benefits.  Social Security Ruling ("SSR") 82-52, 1982 WL 31376, at *1.  Entitlement to

SSI benefits begins as of the month of application or the date of onset, whichever is later.  SSR

82-52, *supra*, at *2.  In addition, in making the entitlement determination in SSI cases, the

Commissioner may consider evidence relating to the period up to the date of the ALJ's decision.

20 C.F.R. §§ 416.1470(b); 416.1476(b)(1) (2000).  Thus, to be eligible for SSI benefits, Miller

3

must establish that he was disabled for a one-year period between the date of onset and the date of the ALJ's decision (July 29, 1998).   Evidence of Miller's condition between the date of onset, September 1, 1989, and the date of the ALJ's decision is relevant in this case and may be considered in determining whether he is disabled within the meaning of the Act.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.   If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are:   at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits [his] physical or mental ability to do basic work activities . . . ;"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

---

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2000); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2000); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. §§ 404.1520(b), 416.920(b) (2000).

[5]20 C.F.R. §§ 404.1520(c), 416.920(c) (2000).

4

1 (2000);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, he is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10] In the case at bar, the ALJ made his dispositive determination of non-disability at step five of the sequential evaluation.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992. In Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) the Tenth Circuit described,

---

[6]20 C.F.R. §§ 404.1520(d), 416.920(d) (2000). If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent a person from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a) (2000).

[7]20 C.F.R. §§ 404.1520(e), 416.920(e) (2000).

[8]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. §§ 404.1567, 416.967 (2000).

[9]20 C.F.R. §§ 404.1520(f), 416.920(f) (2000).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

5

for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects. [Citations omitted].

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Miller contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry his burden of proof, and that the Commissioner did not apply the correct legal standards.

In the final ALJ decision, which is the subject of this appeal, Judge Nail considered the testimony of the VE and made the following findings: (1) Miller has not engaged in substantial gainful activity after his alleged onset date; (2) Miller has the following severe impairments: alcohol dependence, reportedly in partial remission, dysthymia,[11] intermittent explosive disorder (provisional), major depression, recurrent, in partial remission, panic disorder with agoraphobia,[12] and antisocial features; (3) Miller's impairments do not meet or equal any of the Listings; (4) Miller is unable to return to his past relevant work and therefore, the burden shifted to the Commissioner at step five to show that Miller's age, education, work experience and residual functional capacity would permit him to successfully adapt to a significant number of jobs

---

[11]Defined as "mental depression." Dorland's Illustrated Medical Dictionary 415 (26th ed. 1981).

[12]Defined as "overwhelming and incapacitating anxiety on traveling away from the safety of home or on being in crowded places." Dorland's Illustrated Medical Dictionary 41 (26th ed. 1981).

available in the national economy; and (5) there are indeed jobs existing in significant numbers in the national economy which Miller can perform, including custodial worker, assembly worker, packer and dishwasher.  The ALJ therefore found that Miller is not disabled.

Miller appeals only the last finding.  He argues that the ALJ's decision was not supported by substantial evidence in that the ALJ erred in ruling that Miller retained the RFC to perform four jobs in the national economy, failed to accord substantial weight to the opinion of Miller's treating physicians, and failed to accord the appropriate weight to the disability determinations of other agencies.

<u>Discussion</u>

A. <u>The ALJ Did Not Err in His Step Five Analysis</u>

ALJ Nail's finding that Miller can perform four particular jobs, which exist in substantial numbers in the national economy, is the focus of this appeal.  Miller asserts that the ALJ's RFC determination was flawed, in that the record does not contain substantial evidence to show that he can perform sustained work activities on a "regular and continuing basis" and, furthermore, that the ALJ did not consider all of Miller's impairments and all of his medical records in assessing RFC and did not discuss the medical findings with sufficient specificity.

Miller further argues that the ALJ ignored testimony of the VE which supported a finding of disability and focused only on those portions of the testimony which supported the finding that Miller could perform certain jobs existing in the national economy.  Miller asserts that the ALJ ignored the VE's testimony as to the various stress levels associated with the four jobs he identified, the VE's statement that a person with a propensity toward unprovoked violence would be unemployable, his assertion that a claimant who suffered frequent panic attacks in groups could

7

not maintain employment, and his statement that such an individual could not work on a regular

basis.

The Court finds that the ALJ's RFC assessment and finding that Miller could perform jobs

in the national economy was supported by substantial evidence.

> RFC is the individual's maximum remaining ability to do sustained
> work activities in an ordinary work setting on a regular and
> continuing basis, and the RFC assessment must include a discussion
> of the individual's abilities on that basis. A 'regular and continuing
> basis' means 8 hours a day, for 5 days a week, or an equivalent
> work schedule. RFC does not represent the least an individual can
> do despite his or her limitations or restrictions, but the most.

SSR 96-8p (July 2, 1996), 1996 WL 374184, at *2.

Although the record in this case does contain evidence that Miller has not worked on a

regular and continuing basis, the record is also replete with evidence that Miller's sporadic work

history is a result of conscious choices on his part, including a refusal to accept psychological

treatment which would enable him to work, and refusal to cooperate in alcoholism treatment in

spite of medical opinions that his drinking behavior is within his voluntary control.

### 1. Factual Background

In November 1990, Miller underwent court-ordered referral to the Rio Grande Alcoholism

Treatment Center after he went into a rage and beat his wife. At the time of his admission to the

treatment program, Miller was noted as angry, resentful and resistant to authority. In December

1990, the Center's therapist noted that Miller felt he needed to prove to people that he cannot be

"stepped on," and this inclination made him resistant to attending Alcoholics Anonymous ("AA")

meetings. (Tr. 267-68). At the time of Miller's discharge, it was noted that although he was

generally compliant, he had made little progress in that he still held onto resentment and

rationalization and was in denial. He showed resistance to working in groups. (Tr. 265-66).

In January 1991, a therapist at Taos County Community Services noted that Miller's problems included anger, inability to get along with people and to keep a job, depression, and mood disorder. The therapist noted that Miller was compliant and seemed sincere about working on his sobriety, although he was not totally committed to recovery. (Tr. 181-83). From March to October 1991, Miller was treated at the Taos Community Mental Health Center (TCMHC). A Pre-Intake Assessment dated February 1991 stated that Miller had a problem with anger, that he would get out of control and go into a rage and a blackout. (Tr. 207). He was described as having impaired impulse control and being potentially homicidal. (Tr. 210).

In March 1991, he told the counselor that he had trouble with anger, that it came on suddenly and prompted feelings that had to do "something physical." The counselor noted although Miller showed good insight and intelligence, his judgment and impulse control were impaired. He was diagnosed with panic disorder and possible explosive disorder. (Tr. 200). On April 3, 1991, Miller told the counselor he had a violent outburst the night before and broke some furniture. (Tr. 199). By April he was doing better, but he told the counselor that he wasn't sure he wanted to continue therapy and seemed to blame the counselor for his problems. (Tr. 199).

On April 17, 1991, Miller was evaluated by Dr. Donald Fineberg. Dr. Fineberg's diagnostic impression was that Miller probably had borderline personality disorder, characterized by poor concentration, angry outbursts, difficulty getting along with people, a hollow, empty feeling, and anger that he experienced for no reason. (Tr. 218). The doctor's prognostic impression was that Miller was dealing with a lifelong condition, but that "the symptoms that the patient described should be within his voluntary control, and therefore the capacity to sustain work

activity should not be as compromised, as the patient himself experiences it." The doctor concluded that Miller has had a lot of difficulty managing his life and that it has undoubtedly been a struggle for him, and he stated he felt great sympathy for the patient, "who is working very hard to deal with the problems that confront him." (Id.).

Also in April 1991, Miller was evaluated by psychiatrist Dr. Steven Knee of the Taos County Community Services. Dr. Knee noted a history of "spells" starting in early adolescence, which began with light-headedness and ended in "behavioral discontrol." He stated that Miller had worked to remain sober, with difficulty, since December 1990 but also indicated that Miller had been "self-medicating for years" with alcohol. Recent treatment with Klonopin and psychotherapy had reduced Miller's anxiety. His mental status examination was normal in most areas, with the exception that his judgment and impulse control showed significant impairment. (Tr. 422).

Dr. Knee's diagnostic impression was that Miller suffered from panic disorder, alcohol dependence (episodic), and a mixed personality disorder with borderline and avoidant features. (Tr. 423). In his assessment, Dr. Knee stated that Miller showed a long history of dysfunctional behavior and that overlying his significant character pathology is a panic disorder. Significant improvement was seen, however, when Miller was not drinking and was taking his medications as directed. Dr. Knee concluded, "However, in spite of improvements his characterological problems tend to interfere with smooth interpersonal functioning. At this point in his treatment, I doubt that he could be gainfully employed on a consistent basis." (Id.).

In a session at TCMHC on May 20, 1991, Miller stated he wanted a new therapist because he couldn't relate to the one he was then seeing. He was described as very angry and upset and

10

projecting all his problems onto the program and staff. In June, Miller told his therapist that he was afraid to be alone and described his panic disorder. He also said he was afraid of his own anger, that he would sometimes go into a rage for no apparent reason. He told the therapist that there was a point, in the sequence of sensation-rage-explosion, when the fear disappeared and he felt omnipotent; the therapist told him the immediate payoff of this sequence was freedom from fear, and that although Miller's ex-wife described him as sad, anxious and fearful, the only emotion he would acknowledge to himself was anger. (Tr. 191-93).

In a Quarterly Report from TCMHC dated June 26, 1991, Miller's prognosis was noted to be fair. He consistently attended sessions. Initially he was highly anxious and vented anger at various people and agencies. In subsequent sessions, he became more relaxed and introspective, less angry and willing to explore the panic-leading-to-anger cycle. (Tr. 232). Miller's clinical syndromes were noted to be panic disorder with agoraphobia, characterized by inability to control aggressive impulses at times of emotional panic, a severe degree of anxiety when alone or when working with others, and a tendency to use alcohol to self-medicate. (Tr. 233-34).

In July 1991, Miller and his therapist discussed his relationship with his parents. His father was a military man, and very remote. (Tr. 189). There is evidence elsewhere on the record that when Miller was a child, his father was physically abusive to him, often beating him with a belt. (Tr. 428). His mother was a geologist who paid more attention to her work than to her son, and she once told Miller that she would not have chosen to have a child but only did so because her husband wanted an heir. Miller said his early childhood was like "training," apparently meaning military training, and the therapist responded that he now understood Miller's

11

"emphatic insistence" on not following orders. (Tr. 189). In July or August, Miller told his therapist that he felt empowered when physically assaulting another person. (Tr. 236). In August or September 1991, Miller's therapist gave him a letter to take to the state Income Support Division to prove he'd been to counseling sessions; this triggered an expression by Miller of shame and rage at having to deal with government bureaucracies, which felt, he said, like the military-style regimen he was subjected to as a child. (Tr. 238). By September 13, 1991, Miller had improved somewhat and even seemed relaxed about his denial of benefits by Social Security. (Tr. 239).

In a Quarterly Report dated September 26, 1991, Miller was described as talkative in sessions but very resistant to any insight or suggestion for changing his beliefs and behaviors. Miller stated he was angry about being turned down for SSI, because he cannot work with other people without getting irritated, can't think of any work he wants to do alone, and doesn't want to work for $5.00 an hour. (Tr. 243). In a session in October 1991, Miller said he was not interested when offered suggestions for desensitizing his avoidance of other people. He was irritable and angry and felt the world was against him. (Tr. 239).

Throughout October 1991, Miller expressed dissatisfaction with the therapy he was receiving at TCMHC. When offered help in changing his behavior, he declined. He became angrier over the course of the month and began drinking heavily again. The counselor offered him the choice of agreeing to stay off alcohol and coming to the sessions ready to work, or else terminating the therapy. Miller chose the latter, asked for his medical records, and said he was going to sue TCMHC. (Tr. 240-242).

In October 1992, Miller was evaluated by psychologist Dr. Alice Meador. Miller told her

that he had had 20 or more jobs since 1974, that he had led a very transient life and never kept a stable job, usually quitting because he "can't handle being told what to do." (Tr. 276-77). He told her that he liked the way he lived, which was to stay home most of the time and avoid contact with people. He said he felt uncomfortable, anxious and irritable around crowds of people. Dr. Meador wrote that, although such persons are unhappy and worried, their depression is typically ingrained and they have little motivation to change; their adjustment to their depressive state makes it difficult to engage them in psychotherapy. (Tr. 278).

Dr. Meador's diagnosis was that Miller suffered from alcohol dependence, recurrent major depression, panic disorder with agoraphobia, and antisocial features. (Id.). She stated further that Miller had several mental conditions that interfered with his ability to function in any work setting, including a long history of alcoholism, antisocial features probably related to his upbringing, depression, and an anxiety disorder in the form of panic attacks. She recommended short-term individual psychotherapy oriented toward social skills and assertiveness training, feeling that long-term analytic therapy would probably not be productive. (Tr. 279).

In January 1993, the New Mexico Human Services Division notified Miller that, based on Dr. Meador's letter, his disability was established as permanent. (Tr. 280). However, in June of that year, his general assistance payments were cut off because Miller refused to attend weekly mental health counseling at Taos County Community Services, a contingency requirement for continued receipt of payments. (Tr. 286-90). In October 1993, Miller went to La Clinica de Taos, complaining of increased anxiety and aggression over the past few days and feelings that he might hurt someone. He was given Xanax and Lithium, which helped him control these feelings. (Tr. 296-301).

13

In June 1994, Miller went to the Questa Health Center, complaining of panic attacks and requesting a prescription for Xanax. He was given drug treatment as well as counseling, but was not seen by a doctor at Questa. The recommendation there was that he get prescriptions filled by his regular psychiatrist. (Tr. 436-38, 442).

In August 1994, Miller was evaluated by Robert Krueger, a psychologist. Miller reported at that time that he had stopped taking the Lithium because of concerns about side effects; however, he was still talking Trazodone and Xanax. He reported that he was no longer getting counseling at TCMHC. (Tr. 430). Dr. Krueger found Miller to be depressed, tense, irritable, with a low tolerance for frustration and an overall impression of strong feelings of underlying anger. (Id.). He noted that Miller displayed a great deal of emotional turmoil and distress, high levels of anxiety, depression, and confused thinking, and that persons with this pattern have strong feelings of anger and may have strong tendencies for angry and rebellious acting-out behaviors. Dr. Krueger diagnosed Miller with alcohol dependence (in partial remission), depression, intermittent explosive disorder (provisional), and bipolar disorder. (Tr. 431-32). He concluded that Miller's long term emotional and behavior problems, along with his alcoholism, have caused and will continue to cause a significant impairment in his ability to work. (Tr. 432).

Based on Dr. Krueger's evaluation, the Department of Veteran's Affairs awarded Miller a nonservice-connected disability pension in June 1995, noting that Miller is unable to secure and follow substantially gainful employment, due to his disability. (Tr. 357).

From November 1994 until August 1995, Miller was treated by therapist Richard Normad at the Taos Mental Health Center. In November 1994, he told the therapist that he resented having to comply with all of the requirements that Social Services and Social Security were

14

demanding of him.  He stated that he felt a conflict over wanting to come to therapy and being told by the government that he had to come.  (Tr. 465).  In February 1995, he stated that, although his life was more manageable when he took his medications, he nevertheless felt resentful at being told by Social Security that he had to take them.  (Tr. 461).  In March 1995, he told the therapist that he did not like people and basically felt he could not trust anyone.  (Tr. 456).  At the end of the that month, Normad reported in a letter that he had not noticed any improvement in Miller's condition since their sessions began in November 1994.  Specifically, Normad wrote that Miller continued to say that he disliked and mistrusted just about everyone "on this planet." He concluded that Miller's ability to engage in any gainful employment is "extremely questionable" because of his antisocial features and inability to take orders from, and get along with, other people.  (Tr. 455).

In April and May 1995, Miller told Normad that he experienced fits of rage during which he appeared to black out and become emotionally destructive.  Miller described these "fits" as beginning with a physical feeling of light-headedness, moving downward through his body until he felt he might pass out.  (Tr. 452).  During this period, Miller also expressed rage at the fact that he had been rejected for Social Security benefits; he accused Normad of holding staff meetings about him and reporting to Social Security that there was nothing really wrong with him.  (Tr. 451).  Miller also reiterated his inability to work for anyone because he  could not tolerate being told how to do things; Normad noted Miller was unable to express or acknowledge any feeling other than anger.  (Tr. 449).  Miller's sessions with Normad ended in the spring of 1995 when Normad left the agency.  (Tr. 448).

At the hearing before Judge Waits on July 31, 1996, Miller stated that he was still having

15

panic attacks, sometimes as often as 3 to 4 times per week. (Tr. 494-95). When asked by the ALJ whether there had been any change in his ability to get along with people, Miller responded that there had been no change, because he just didn't deal with people at all. He stated that he had no friends and did not socialize with anyone except his ex-wife. (Tr. 495-96). He described his problems in keeping employment: he has a problem getting along with people, he doesn't like people touching him, being around him, or telling him what to do or how to do it. He has lost control in the past and become violent at work. (Tr. 499).

### 2. The VE's Testimony

Miller did not appear at the final hearing held before Judge Nail on April 23, 1998. he was represented by attorney Michael Liebman, who explained that because of Miller's propensity for violence and his perception that the lengthy Social Security process was an exercise in futility, he chose not to appear. (Tr. 320). The hearing focused on the testimony of the Vocational Expert, Gerald Belchick.

Based on Belchick's testimony, ALJ Nail concluded that Miller was capable of working at the following jobs existing in significant numbers in the national economy: assembly worker, custodial worker, packing worker and dishwasher. (Tr. 308). The VE listed these jobs in response to a hypothetical from the ALJ of a younger individual with a GED and no physical limitations but who, because of emotional and mental considerations, is confined to non-public work and minimal contact with co-workers and supervisors. (Tr. 327). After eliminating jobs that require public contact, the VE noted that what remains are "ordinary physical jobs" where the contact with others would be "minimal and ordinary and normal," as "you have to have some contact with people in almost every job that exists." (Tr. 327-28). He then listed four jobs that

would be appropriate for Miller: dishwasher, custodial work (particularly at night when not many others are around), assembly jobs and non-agricultural packing jobs, where the worker would stand at his task and put things together or pack things. (Tr. 327-29).

The ALJ then added to the hypothetical that the job would need to be a simple repetitive routine type position with relatively low stress. The VE responded that the assembly and packing jobs involved medium to high stress in that quotas were involved; the dishwashing job would be a medium stress level; and the custodial job would produce the lowest stress. (Tr. 329-330).

The ALJ then expanded the hypothetical, inquiring whether a person, who because of substance abuse or mental and emotional problems could not appear at work on a regular basis or perform a 40-hour work week, would qualify for any jobs. The VE responded that all jobs would be eliminated under these circumstances. (Tr. 332). Under questioning by Miller's attorney, the VE testified that a person with a tendency toward unprovoked violence due to an impulse control disorder would not be able to maintain employment, and the same would be true for a person who suffered from frequent panic attacks in groups of people. (Tr. 334). The VE also stated that, even for the night cleaning job the worker would have to be able to take verbal instructions, and he stated further that, "There's almost no job where you can function all by yourself . . . there are almost no jobs that I'm aware of that can just sort of be totally isolated. Everybody has a boss, everybody has a supervisor." (Tr. 340).

3. The Evidence Supports a Finding that Miller Could Work at a Custodial Job.

The VE's statement that Miller could work at a custodial job was based on a hypothetical posed by the ALJ of a younger individual with a GED and no physical limitations who is confined to non-public work and minimal contact with co-workers and supervisors due to emotional and

17

mental limitations.  In addition, the ALJ noted that the job would have to involve routine work with relatively low stress.  This hypothetical describes Miller's circumstances and is supported by substantial evidence from the record.

Although Miller frequently expressed the sentiment to various doctors or therapists that he just didn't like being around people and could not stand to take direction, nevertheless, he has held various jobs over the past twenty years, one of which -- the work on the fishing boat – continued off and on for eight years.  (Tr. 75).  The ALJ hypothesized a person who could not work with the public, and the record supports this factor; there is no indication on the record that Miller could sustain work which involves public contact.  The ALJ added that this person would have to work in a job which involved minimal contact with co-workers and supervisors and relatively low stress.  The record indicates that Miller does not react well to stress at work (Tr. 167, 383), so the "relatively low stress" factor noted by the ALJ is justified.

Miller appears to argue that he would need a job with no stress whatsoever and no human contact whatsoever.  The record indicates that although Miller has a great deal of difficulty working with others and dealing with stress, and that he has an acute psychological impairment in this regard, there are two primary reasons why the ALJ's finding of nondisability is correct and supported by the evidence:  (1)  Miller's problems are to a large extent caused or exacerbated by his alcoholism, a condition which is not compensable in and of itself and over which, in any case, he retains voluntary control and for which he refuses to get help; and (2) Miller has refused to cooperate with treatment aimed toward diminishing the symptoms of his underlying psychological impairment, exemplified by his statement to a therapist that he likes the way he lives, that is, staying home most of the time and away from other people.  (Tr. 278).

18

a. Effect of Alcoholism on Miller's Eligibility

Even if an individual would otherwise be considered "disabled," he is not eligible for

Social Security benefits if alcoholism is a contributing factor material to the determination of

disability.   42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935.

Alcoholism is a "contributing factor" if the claimant would still be disabled if he stopped using

alcohol.  20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).

The record in this case indicates that Miller's underlying mental impairment would not

render him incapable of gainful employment without the added factor of alcohol abuse.  In April

1991, Dr. Knee noted that Miller's condition significantly improved when he was not drinking

and was taking his medications as directed (although the doctor did state he doubted that Miller

could be gainfully employed on a consistent basis).  (Tr. 423).  In August 1991, Dr. R. Romanik

wrote in a Psychiatric Review Technique form that Miller's temper is better controlled when he

is being treated with medication and therapy and stays off alcohol.  He concluded that Miller is

capable of routine, low-stress work that does not bring him into close contact with the public.

(Tr. 167).  In another Psychiatric Review Technique, a psychologist noted that Miller had a long

history of alcohol abuse, but that he was capable of routine, non-stressful work if his contact with

other people were limited; she noted also that Miller's profile would improve if he ceased

drinking.  (Tr. 381-82).

Dr. Krueger evaluated Miller in August 1994 and noted in the "Summary and Conclusions"

portion of the report that:

> Mr. Miller also reported having a long history of alcohol problems,
> and he said that he is continuing to consume alcohol on an almost
> daily basis, but in recent years he has cut down on the amount that

19

> he drinks . . .  Overall, it appears that Mr. Miller's long term emotional problems and behavior problems along with his alcoholism have caused and are continuing to cause a significant degree of impairment in his working ability.

(Tr. 432).

Miller himself wrote in January 1991, in one of his initial submissions in support of his application for benefits, that "I am now and have been an alcoholic for a number of years and have had problems keeping employment."  (Tr. 122).  He also said in a 1992 hearing that a typical pattern for him has been that he'll have a run-in with an authority figure, "people telling me what to do and how to do it and I get upset and end up quitting the job or going out and getting drunk . . .."  (Tr. 51).  His ex-wife testified at the April 1992 hearing that Miller's entire personality changes when he's drinking, in Jekyll-Hyde manner, and he becomes violent.  (Tr. 61).

At the July 1993 hearing, Miller testified that he could not do even a janitorial job which would not require much interaction with others, because "it'll be fine for a week, maybe fine for a month and then I'll get a paycheck and the job will get to be aggravating just like they always do and I'll end up picking up a drink and then I won't go to work and I might be drunk for a day and I might be drunk for two or three years."  (Tr. 78).  He also said:

> See I don't want welfare and food stamps, if I can just get a little check once a month, then I can figure out a way to get by with it without having to deal with all the garbage, without having to deal with the people.  And if that's not an acceptable way of doing things, then I don't know what I'm suppose[d] to do.  I guess I can go out and rob banks, sell drugs.  But see these are not things that I do . . .  So what am I suppose[d] to do?  Go out work for a couple weeks, get aggravated, say the hell with it, get drunk, not make it back.  I don't like that.

20

(Tr. 83). This record supports the conclusion that alcohol is the primary reason, or at the very least a contributing factor in, Miller's inability to keep a job for any length of time.

In addition, the record indicates that Miller can, if he wishes, control his drinking behavior and that his drinking is to a large extent voluntary. *See*, <u>Coleman v. Chater</u>, 58 F.3d 577 (10th Cir. 1995) (claimant must show a loss of ability to control drinking). In April 1991, Dr. Fineberg evaluated Miller and found that although he was working hard to deal with his problems, nevertheless, his symptoms "should be within his voluntary control" and his "capacity to sustain work activity should not be as compromised" as Miller thinks. Miller stated in one of the hearings that he did not drink while working on the shrimp boat, because people can lose limbs and lives that way; however, he said he would typically "stay drunk" whenever he was off the boat. (Tr. 75-76). In February 1991, he reported having been sober for 90 days. (Tr. 207). In March 1991, he told a therapist that he had stopped drinking alcohol in November 1990, before which time he had been on a six-month drunk. (Tr. 201).

In October 1991, Miller's therapist confronted him with the fact that she had seen him coming from the market with a big bottle of wine and a case of beer; Miller responded that he liked to drink on the weekends. (Tr. 241). In August 1994, medical reports noted that Miller continued to drink but had cut down on the amount. (Tr. 429). In August 1995, he reported have 2 beers a day (Tr. 446), and at one of his hearings, in July 1996, he testified that he used to be a heavy drinker but after nine months at AA and various therapy sessions, he was down to about 1-2 beers a day. The record supports the conclusion that Miller's drinking is within his voluntary control and that without the alcohol abuse, he would be capable of gainful employment.

b. <u>Failure to Cooperate in Treatment</u>.

A claimant who fails to follow a prescribed treatment or fails to cooperate with his doctors will not be awarded Social Security benefits. 20 C.F.R. §§ 404.1530; 416.930.   The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment.  <u>Decker v. Chater</u>, 86 F.3d 953, 955 (10th Cir. 1996); <u>Diaz v. Secretary of Health & Human Servs.</u>, 898 F.2d 774, 777 (10th Cir. 1990).

There is no question that Miller suffers from a psychological impairment.  However, the record indicates that he could benefit from therapy but has voluntarily resisted steps that would help him regain his capacity to work.  Discharge summary notes from Miller's stay at the Rio Grande Alcoholism Treatment Program in late 1990 state that he made little progress over the course of treatment.  He showed resistance to some groups and education efforts and although he was basically compliant, his determination to stay sober "could use some improvement."  (Tr. 256-66).  Similarly, it was noted in 1991 at Taos County Community Services that he was working on his sobriety but was "not totally committed" to recovery.  (Tr. 181).

Miller's therapist at the Taos Community Mental Health Center attempted to help him with anger management, but Miller did not follow through with the assignments he was given.  (Tr. 193, 236, 240).  At one point, the therapist asked him to consider medication, but he refused. Later that same session, Miller stated that he was scared of himself; however, when the therapist asked if he wanted to voluntarily check himself into the hospital, Miller refused.  (Tr. 193).  In the fall of 1991, the therapist noted that Miller was very resistant to any suggestions for changing his beliefs or behaviors and that he was resistant to working on issues of anger management and vocational rehabilitation.  (Tr. 243).  Miller rejected the therapist's suggestion that he could

22

"desensitize" his avoidance of people and refused the therapist's offer to work with Miller on the issue of his fear of dealing with people. (Tr. 239-240).

When the therapist pointed out that Miller had consistently "disqualified" any suggestion aimed toward forming new behaviors that might change his situation, Miller responded that he did not want to change into a different person and said that a program of systematic desensitization would amount to reprogramming. (Tr. 242). Upon being challenged by the therapist to arrive at his sessions sober and ready to work on his problems, Miller terminated treatment, asked for his records, and said he was going to sue the treatment center. (Tr.242). In June 1993, Miller's General Assistance benefits were terminated for his failure to continue mental health treatment. (Tr. 287).

The ALJ's conclusion that Miller could work at a janitorial job, particularly one at night, when he would be working with minimal supervision and minimal contact with other people, is well supported by the record. The fact that he does not get along well in groups and has trouble interacting with others does not disqualify him from all employment, and the ALJ appropriately so found. The VE testified that there are approximately 15,000 janitorial jobs in New Mexico at the medium exertion level, and over 2,000,000 such jobs in the national economy.

B. Other Issues Raised by Miller

Miller also argued that in reaching a decision of non-disability, the ALJ failed to accord appropriate weight to the opinions of Miller's treating physicians, and failed to consider the disability determinations of other agencies. Neither of these grounds provides a basis for overturning the decision.

Miller argues that two of his treating physicians, Dr. Knee and Richard Normad, rendered

23

opinions that Miller is incapable of gainful employment, and the ALJ should have given controlling weight to these opinions. The Secretary will give controlling weight to a treating physician's opinion which reflects judgment about the nature and severity of the claimant's impairments, including symptoms, diagnosis and prognosis, and any physical or mental restrictions. 20 C.F.R. §§ 404.1527, 416.927. However, if the opinion proffered by the physician is whether or not the claimant is disabled from work, "[t]hat opinion is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the Secretary." Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994), citing 20 C.F.R. §§404.1527(e)(2), 416.927 (e)(2). Thus, whether or not Dr. Knee or Mr. Normad can be considered "treating physicians," their opinions regarding Miller's ability to engage in gainful employment, while possibly helpful to the ALJ, need not be given controlling weight. As discussed above, the record supports the ALJ's finding that there are jobs in the national economy that Miller could do.

Miller also argues that the ALJ failed to accord the proper weight to the disability determinations of the Veterans Administration and the State of New Mexico, both of which awarded Miller disability benefits. The Court notes that New Mexico eventually terminated Miller's benefits for failure to comply with his obligation to continue therapy; as noted above, failure to cooperate in treatment is a valid ground for an ALJ's refusal to award benefits. Although the VA may consider Miller to be disabled, this determination is not binding on the Social Security Administration. Baca, at 480 (10th Cir. 1993). The final decision is reserved for the Secretary, and the record supports the ALJ's finding of non-disability.

The Court takes note of the recently filed unopposed motion by Miller's counsel to

24

withdraw from the case [Doc. 11].  An order granting the motion will be filed shortly.  The Court

commends Miller's counsel for his excellent briefing and advocacy in this matter.

### Recommended Disposition

That Miller's Motion to Reverse or Remand [Doc. 7] be denied and the case be dismissed.


Lorenzo F. Garcia
United States Magistrate Judge

25

## SOCIAL SECURITY ADMINISTRATION
### Office of Hearings and Appeals

**305**

### DECISION

| | |
|---|---|
| **IN THE CASE OF** | **CLAIM FOR** |

**CLAIM FOR**

Period of Disability,
Disability Insurance Benefits, and
Supplemental Security Income

KELSIE C. MILLER
(Claimant)

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
(Wage Earner)                    (Social Security Number)

### INTRODUCTION

The present appeal arises following a filing of a request for
hearing by Kelsie C. Miller.  This case is before me pursuant to
an Appeals Council Remand Order dated October 31, 1997 and listed
Exhibit B-32, p. 2.  In compliance with the Appeals Council
Remand, the undersigned Administrative Law Judge is to follow the
directives set forth in Exhibit B-25, which is a previous Order
entered by the Appeals Council, dated January 3, 1997 (Ex. B-25,
pgs. 2-4).  In accordance with Exhibit B-25, page 3, the Appeals
Council directed that I obtain supplemental evidence from a
vocational expert to clarify the effect of the assessed
limitations on the claimant's occupational base; that
hypothetical questions should also include the specific capacity
and/or limitations established by the record as a whole and that
I should ask the vocational expert to identify samples of
appropriate jobs and state the incidence of such jobs in the
national economy (id, p. 3).

On April 23, 1998, I held a hearing in Santa Fe, New Mexico.  The
claimant did not appear and requested that I waive his presence
at the hearing through his attorney, Mike Liebman (Ex. B-36).
The claimant's attorney appeared on his behalf, as did Gerald D.
Belchick, a vocational expert requested by me to appear and
provide testimony in respect to the Appeals Council Remand Order.
After giving full and complete consideration to all the evidence,
including the testimony of the vocational expert, the following
are my findings:

1.   The claimant filed an application for a period of disability
     and a disability insurance benefits, and supplemental
     security income payments under Titles II and XVI of the
     Social Security Act on January 2, 1991.  He alleges an onset
     of disability as of September 1, 1989.  The claimant claims
     disability due to manic depression, panic attacks, and

KELSIE C. MILLER
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

2

.306

acrophobia (Ex. B-8, p. 1). The claimant maintained disability insured status at all pertinent times.

2. The claimant has not engaged in substantial gainful activity after his alleged onset date.

3. The claimant has had the following "severe" impairments during times at issue: alcohol dependence, reportedly in partial remission; dysthymia; intermittent explosive disorder (provisional); major depression, recurrent, in partial remission; panic disorder with agoraphobia; antisocial features (Exs. B-14, p. 3; B-15, p.5).

4. During times at issue, the severity of the claimant's mental condition has not met or equalled any Sections set forth in the Listings of Impairments, as found in Appendix 1, Subpart P, Social Security Regulations No. 4. I have specifically reviewed Listings 12.09, 12.04, and 12.06 and I find that the claimant falls short of satisfying Listings level criteria to be deemed disabled.

I find that the claimant is not presumptively disabled primarily in reliance on Exhibit B-21, which contains counseling and therapy notes. The theme in these documentary pieces of evidence is the claimant's anger and threats of violent outbursts. The provisional diagnosis of intermittent explosive disorder would seem to fall within this category; however, the fact the claimant has been diagnosed as suffering with major depression and alcohol dependence and dysthymia leads me to believe that his mental condition should be subjected to the criteria contained in Listing 12.04. As such, there is no significant anhedonia, no significant psychomotor retardation, no significant sleep disorder, and the like. Therefore, I find that the claimant falls far short of satisfying these severity level criteria in the Listings.

5. The claimant did not testify at the hearing and I can not make an assessment of the claimant's credibility as it relates to this hearing. However, the vocational expert testified as to job availability in the national economy.

In a mental status examination, the claimant was found to be alert and well oriented and generally cooperative with the evaluation (Ex. B-15, p. 3). The examiner received the impression that the claimant had a chronic problem with anger control and mood swings but, nevertheless, displayed good verbal skills and generally scored at a high average level on an intelligence test. He did not show any particular impairment of concentration or memory.

KELSIE C. MILLER
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

3

.307

Robert Krueger, PhD., a clinical licensed psychologist believed that the claimant's longterm emotional problems and behavior problems along with his alcoholism had caused him a significant degree of impairment in his working ability.  However, the alcohol dependence at that time was reportedly in partial remission (id., p. 5).  It was Dr. Krueger's opinion that the condition was likely to persist for more than one year from August 24, 1994.

In another psychological evaluation done by Alice E. Meador, PhD., she noted antisocial features in his personality and a long history of alcoholism and recommended that he participate in short term psychotherapy that would be oriented toward social skills and assertiveness training (Ex. B-14, p. 4).

As noted earlier, the claimant underwent supportive psychotherapy at Taos Mental Health Center (Ex. B-21).  His anger problem seemed to surface more than any other element of his mental condition during those counseling sessions.

Having summarized briefly the overall mental condition of the claimant and his notorious use of alcohol of long standing, I asked the vocational expert to testify as to the impact of the claimant's limitations on his job base.

Hypothetically, I asked the vocational expert to assume the following:  an individual with the same vocational profile as the claimant, with limitations including a prohibition against working extensively with the public and a need for minimal contact with coworkers and supervisors, and mental and emotional problems that do not allow an individual to deal well with people, but without exertional limitations.  The vocational expert said there would be an impact on the job base but there were still numerous jobs the claimant could perform that exist in the national economy.  He identified cleaning jobs as a category of jobs that may allow for low stress level and minimal contact with co-workers and supervisors.  The vocational expert identified Custodial Work under job #381-687.018 of the Dictionary of Occupational Titles (DOT), Fourth Edition.  As to the medium level of exertion, in the unskilled category, there were 15,000 such custodial positions in the region and some 2 million nationally.  This was considered to be a low stress job and in the light exertional category, there existed 12,000 regionally and 181,000 nationally.

The vocational expert also identified assembly-type work as category of jobs that the claimant could perform; however, he did note a medium-high stress level associated with assembly work because of production quotas.  As to the unskilled light exertional category, there were 2,100 regional jobs and over 700,000 nationally.

KELSIE C. MILLER
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                                    4                        **308**

He identified packing jobs, nonagricultural in nature, that the claimant would be able to perform.  The Assembly job was listed under the DOT as #706-684.022 and the packing job was listed as #920-587.018.  In the unskilled light category of the packing jobs, there are 600 regionally and over 200,000 nationally.

He identified Dishwasher listed as job number #318-667.010.  In the light category, there are 1,700 regional jobs and over 219,000 national jobs.

Having established by hypothetical questions that there do exist jobs in the national economy, and having stated the incidence of such jobs by the responses of the vocational expert, I find that the claimant has retained the residual functional capacity for work at all exertional levels during the relevant time period.

6.   The claimant has been a younger individual during all times at issue.  The claimant has completed the 10th grade.

7.   The claimant has not been able to return to his past relevant work since he has limitations in respect to having contact with the public and requires minimal contact with co-workers and supervisors.   Consequently, the burden shifted to the Commissioner to show that the claimant's age, education, work history, and functional capacity permits a successful adaptation to a significant number of other jobs in the national economy.

8.   The responses of the vocational expert confirms that there are and have been jobs existing in significant numbers in the national economy that the claimant can perform.  Examples of such jobs are assembly worker, custodial worker, packing worker and dishwasher.  Therefore, the claimant is not disabled as that term is defined in the Social Security Act.

KELSIE C. MILLER
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

5

**309**

## DECISION

IT IS MY DECISION THAT, based on the applications filed under
Titles II and XVI, Kelsie C. Miller, is not entitled to a period
of disability or disability insurance benefits under Sections
216(i) and 223, respectively of the Social Security Act, and is
not eligible for Supplemental Security Income under Section 1602
and 1614(a)(3)(A) of the Act.

_William F. Nail, Jr._
WILLIAM F. NAIL, JR.
United States
Administrative Law Judge

JUL 2 9 1998
_____
Date

## OHA PSYCHIATRIC REVIEW TECHNIQUE FORM

**310**

NAME: Kelsie C. Miller    SSN: 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

Assessment is for:  Current Evaluation

Administrative Law Judge's Signature                Date

*William J. Harl. Jr.*                          JUL 2 9 1998

I.    MEDICAL SUMMARY

   A.    Medical Disposition(s):    RFC Assessment Necessary
                                        (i.e., a severe impairment is
                                        present which does not meet or
                                        equal a listed impairment)

   B.    Based Upon Category(ies):      12.04, 12.06, 12.09

II.    Reviewer's Notes (Does not apply to OHA)

III.    DOCUMENTATION OF FACTORS THAT EVIDENCE THE DISORDER
     (Evaluation of the existence of a sign or symptom
     CLUSTER or SYNDROME for the Listed Disorder.)

     PRESENT    ABSENT

| PRESENT | ABSENT | | | |
|---|---|---|---|---|
| [ ] | [X] | A. | 12.02 | Organic Mental Disorders |
| [ ] | [X] | B. | 12.03 | Schizophrenic, Paranoid and other Psychotic Disorders |
| [x] | [ ] | C. | 12.04 | Affective Disorders |
| [ ] | [X] | D. | 12.05 | Mental Retardation and Autism |
| [x] | [ ] | E. | 12.06 | Anxiety Related Disorders |
| [ ] | [X] | F. | 12.07 | Somatoform Disorders |
| [ ] | [X] | G. | 12.08 | Personality Disorders |
| [x] | [ ] | H. | 12.09 | Substance Addiction Disorders |

C.    **12.04  Affective Disorders** - Disturbance of mood,
    accompanied by a full or partial manic or depressive
    syndrome, as evidenced by at least one of the following:

    **PRESENT-ABSENT-INSUFFICIENT EVIDENCE**

    1.    [ ]   [x]   [ ]   Depressive syndrome characterized by at
                            least four of the following:
                      a.    [ ]   Anhedonia or pervasive loss of
                                  interest in almost all
                                  activities, or
                      b.    [ ]   Appetite disturbance with
                                    change in weight, or
                      c.    [ ]   Sleep disturbance, or
                      d.    [ ]   Psychomotor agitation or
                                    retardation, or

KELSIE C. MILLER
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
                                            2                    .311

|   |   |   |   |   |
|---|---|---|---|---|
| | | e. | [ ] | Decreased energy, or |
| | | f. | [ ] | Feelings of guilt or worthlessness, or |
| | | g. | [ ] | Difficulty concentrating or thinking, or |
| | | h. | [ ] | Thoughts of suicide, or |
| | | i. | [ ] | Hallucinations, delusions or paranoid thinking |

2.      [ ]  [x]  [ ]  Manic syndrome characterized by at least
                      three of the following:

|   |   |   |
|---|---|---|
| a. | [ ] | Hyperactivity, or |
| b. | [ ] | Pressures of speech, or |
| c. | [ ] | Flight of ideas, or |
| d. | [ ] | Inflated self-esteem, or |
| e. | [ ] | Decreased need for sleep, or |
| f. | [ ] | Easy distractibility, or |
| g. | [ ] | Involvement in activities that have a high probability of painful consequences which are not recognized, or |
| h. | [ ] | Hallucinations, delusions or paranoid thinking |

3.      [ ]  [x]  [ ]  Bipolar syndrome with a history of
                      episodic periods manifested by the full
                      symptomatic picture of both manic and
                      depressive syndromes (and currently
                      characterized by either or both
                      syndromes)

4.      [x]  [ ]  [ ]  Other MAJOR DEPRESSION, RECURRENT, IN
                      PARTIAL REMISSION; DYSTHYMIA


E.    **12.06  Anxiety Related Disorders** - Anxiety as the
      predominant disturbance or anxiety experienced in the
      attempt to master symptoms, as evidenced by at least one of
      the following:

      **PRESENT-ABSENT-INSUFFICIENT EVIDENCE**

1.      [ ]  [X]  [ ]  Generalized persistent anxiety
                      accompanied by three of the following:

|   |   |   |
|---|---|---|
| a. | [ ] | Motor tension, or |
| b. | [ ] | Autonomic hyperactivity, or |
| c. | [ ] | Apprehensive expectation, or |
| d. | [ ] | Vigilance and scanning |

2.      [ ]  [X]  [ ]  A persistent irrational fear of a
                      specific object, activity or situation
                      which results in a compelling desire to
                      avoid the dreaded object, activity, or
                      situation

KELSIE C. MILLER
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

3

.312

| | | | | |
|---|---|---|---|---|
| 3. | [ ] | [X] | [ ] | Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week |
| 4. | [ ] | [X] | [ ] | Recurrent obsessions or compulsions which are a source of marked distress |
| 5. | [ ] | [X] | [ ] | Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress |
| 6. | [X] | [ ] | [ ] | Other: PANIC DISORDER WITH AGORAPHOBIA |

H.   **12.09  Substance Addiction Disorders** - Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.

If present, evaluate under one or more of the most closely applicable listings:

| | | |
|---|---|---|
| 1. | [ ] | Listing 12.02 - Organic mental disorders* |
| 2. | [X] | Listing 12.04 - Affective disorders* |
| 3. | [X] | Listing 12.06 - Anxiety disorders* |
| 4. | [X] | Listing 12.08 - Personality disorders* |
| 5. | [ ] | Listing 11.14 - Peripheral neuropathies* |
| 6. | [ ] | Listing 5.05 - Liver damage* |
| 7. | [ ] | Listing 5.04 - Gastritis* |
| 8. | [ ] | Listing 5.08 - Pancreatitis* |
| 9. | [ ] | Listing 11.02 or 11.03 - Seizures* |
| 10. | [X] | Other: ALCOHOL DEPENDENCE, REPORTEDLY IN PARTIAL REMISSION |

*NOTE:   Items 1,2,3,4,5,6,7,8 and 9 correspond to Listings 12.09A, 12.09B, 12.09C, 12.09D, 12.09E, 12.09F, 12.09G, 12.09H, and 12.09I, respectively.  If items 1,2,3 or 4 are checked, only the numbered items in subsections IIIA, IIIC, IIIE, or IIIG of the form need be checked. The first two blocks under the disorder heading in those subsections need not be checked.

IV.   RATING OF IMPAIRMENT SEVERITY

A.   "B" CRITERIA OF THE LISTINGS

THE FOLLOWING FUNCTIONAL LIMITATIONS (WHICH APPLY TO PARAGRAPH B OF LISTINGS 12.02-12.04 AND 12.06-12.08 AND PARAGRAPH D OF 12.05) EXIST AS A RESULT OF THE INDIVIDUAL'S MENTAL DISORDER(S).

KELSIE C. MILLER
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

4

**313**

NOTE:   ITEMS 3 AND 4 BELOW ARE MORE THAN MEASURES OF FREQUENCY.   DURATION
        AND EFFECTS OF THE DEFICIENCIES (ITEM 3) OR EPISODES (ITEM 4) ARE
        DISCUSSED IN THE DECISION.

Listing(s) under which the items below are being rated:   12.04, 12.06, 12.09

**FUNCTIONAL LIMITATION AND DEGREE OF LIMITATION**

---

1.   Restrictions of Activities of Daily Living:

None[ ] Slight[ ] Moderate[X] Marked*[ ] Extreme[ ] Insuff Evid[ ]

---

2.   Difficulties in Maintaining Social Functioning:

None[ ] Slight[ ] Moderate[X] Marked*[ ] Extreme[ ] Insuff Evid[ ]

---

3.   Deficiencies of Concentration, Persistence or Pace Resulting in Failure
     to Complete Tasks in a Timely Manner (in work settings or elsewhere):

Never[ ] Seldom[X] Often[ ] Frequent*[ ] Constant[ ] Insuff Evid[ ]

---

4.   Episodes of Deterioration or Decompensation in Work or Work-Like
     Settings Which Cause the Individual to Withdraw from that Situation or
     to Experience Exacerbation of Signs and Symptoms (which may Include
     Deterioration of Adaptive Behaviors):

Never[ ] Once/Twice[X] Repeated*(3+)[ ] Continual[ ] Insuff Evid[ ]

---

*Degree of limitation that satisfies the Listings: Extreme, Constant and
Continual also satisfy that requirement.

B.   <u>Summary of Functional Limitation Rating for "B" Criteria</u>

NO. OF FUNCTIONAL LIMITATIONS MANIFESTED AT THE LISTING LEVEL: [0]
(The number must be at least 2 to satisfy the requirements of paragraph B in
Listings 12.02, 12.03, 12.04 and 12.06 and paragraph D in 12.05; and at least
3 to satisfy the requirements in paragraph B in Listings 12.07 and 12.08.)

KELSIE C. MILLER
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

5

**314**

C.    "C" Criteria of the Listings

2.    If 12.06 Disorder (Anxiety Related)

**PRESENT-ABSENT-INSUFFICIENT EVIDENCE**

[ ]   [X]   [ ]   Symptoms resulting in **complete** inability to function
                  independently outside the area of one's home.

(If present is checked, the requirements in paragraph C of 12.06 are
satisfied.)